In the

# United States Court of Appeals

### For the Seventh Circuit

---

No. 05-4780

UNITED STATES OF AMERICA,

*Plaintiff-Appellant,*

*v.*

WILLIAM H. VEAZEY,

*Defendant-Appellee.*

---

Appeal from the United States District Court
for the Central District of Illinois.
No. 05 CR 20006—**Michael P. McCuskey,** *Chief Judge.*

---

ARGUED SEPTEMBER 18, 2006—DECIDED JULY 3, 2007

---

Before BAUER, ROVNER and WILLIAMS, *Circuit Judges.*

ROVNER, *Circuit Judge.* William H. Veazey pled guilty to attempted enticement of a minor to engage in sexual conduct, 18 U.S.C. § 2422(b), and interstate travel for the purpose of engaging in a sexual act with a minor, 18 U.S.C. § 2423(b). At sentencing, the court determined that Veazey committed these offenses for the purpose of producing a visual depiction of sexually explicit conduct with a minor. The court then applied a "visual depiction" guidelines cross-reference that greatly increased Veazey's guidelines sentencing range. The court sentenced Veazey to 324 months of imprisonment, followed by supervised release for a term of life. In this

appeal, Veazey objects to the application of the "visual depiction" cross-reference. We affirm.

## I.

When the early twentieth century thief, Willie Sutton, was asked why he robbed banks, he replied, "Because that's where the money is." In the early twenty-first century, if one were to ask sexual predators why they troll the internet, they might answer, "Because that's where the children are." Such was the case with William Veazey. Law enforcement officers are well aware that predators have fled the public playground in favor of the anonymous internet in seeking out their victims. For that reason, some officers enter internet chat rooms posing as children, serving as bait to the unsuspecting predators. On November 18, 2004, a Decatur, Illinois, male police detective signed onto Yahoo Instant Messenger using the screen name "jodijohnson15," and entered a chat room titled "*!SeXy HiGh SchOol HoTTiEs!*." Veazey was signed into the chat room as "nogames89," and on seeing "Jodi" enter, he began to send her instant messages. The fictitious Jodi identified herself as a 15 year-old girl from Decatur, Illinois, and Veazey (who was 61 at the time) identified himself as a 48 year-old man from Texas.

Jodi and Veazey engaged in numerous online conversations over the next month and a half, and Jodi eventually introduced Veazey to a fictitious 15 year-old friend named "Missy," who used the screen name "missyinil13."[1]

---

[1] For the sake of clarity and brevity, we will refer to the officers posing as Jodi and Missy by those assumed names. For the purposes of the relevant sentencing guidelines, a minor is a person under the age of 18 or an undercover law enforcement
(continued...)

With a female detective posing as Jodi, Veazey also spoke on the phone numerous times with Jodi, in calls the officers recorded. The content of the online and telephone conversations is graphic, demonstrating the techniques of a man who appears well-practiced in the art of manipulating vulnerable adolescents and well-versed in the shorthand phrases that teens use to communicate on the internet.[2]

Within minutes of meeting Jodi online for the first time, Veazey asked Jodi if she would "care to swap pics." Gov. Ex. 1, at 20. Jodi declined to send a picture of herself, claiming her mother had taken her camera away. In that first conversation, Veazey asked Jodi about her sexual history, her willingness to meet him, and her willingness to engage in phone sex with him. Gov. Ex. 1, at 20-22. In the second internet exchange, Jodi revealed that she had told a female friend about Veazey. Veazey again expressed an interest in talking to Jodi on the phone, having sex with her, and obtaining pictures of her. This time, he stated "a nude pic would be nice." Gov. Ex. 1, at 23. When Jodi asked how she could get a nude picture of herself, Veazey suggested that her friend take the photo. Veazey asked if Jodi's friend was bisexual, and then proposed that Jodi and her friend take pictures of each other. Gov. Ex. 1, at 23. After discussing whether Veazey would pay for the pictures (he declined to do so), he persisted, telling Jodi he was falling in love with her and asking twice more, "r u gonna take the pics for me." Gov. Ex. 1, at 23-26. After the

---

[1] (...continued) officer who has represented to the defendant that he or she is under the age of 18. *See* U.S.S.G. § 2G2.1, Application Note 1.

[2] The internet exchanges are full of abbreviations, slang, misspellings and grammatical errors. We will leave those errors intact when we quote relevant passages.

second of those requests, Jodi balked and wrote, "u want me or jus pics. . . . i really hope u wasnt jus sayin all tha fer pics." Gov. Ex. 1, at 26. Veazey then began to pull back from his request for pictures, telling Jodi that he really wanted her and that it was not a problem if she did not "wanna do pics." *Id*. After ascertaining where Jodi lived, the locations of the nearest airport and hotel, and after complaining to Jodi that he had previously flown to North Carolina to meet a girl who did not show up, Veazey told Jodi he would come to visit her. But first he needed two things from her: a cell phone number where he could reach her and a picture of her ("clothes optional") so that he would be able to recognize her at the airport. Gov. Ex. 1, at 26-32. Later in the same internet exchange, Veazey declared his love for Jodi, told her he wanted to marry her and again asked for a picture. *Id*.

In Jodi's third internet chat with Veazey, he asked for a picture soon so that he could look at her every night. This request came shortly after a graphic exchange where Veazey again indicated his wish to have sex with Jodi when he came to Decatur. Gov. Ex. 1, at 36-38. In the fourth chat, Veazey again requested a picture of Jodi, and instructed her on scanning the photo into her computer and then sending it to him via e-mail. He asked if Jodi had discussed taking pictures with her girlfriend and told her he was proud of her when she responded affirmatively. Gov. Ex. 1, at 42-44. In subsequent exchanges, Veazey again was the first to raise the subject of pictures, giving Jodi his home address, instructing her to mail "lots of pics," and asking her if she had sent pictures yet. *See e.g.*, Gov. Ex 1, at 51, 54, 55, 60. In early December, a female detective posing as Jodi spoke with Veazey on the phone for the first time. He asked again for a picture and when she asked if he meant a "regular picture," he replied, "Well, yeah. That wouldn't be very gentlemanly if I asked for anything more now would it." Def. Ex. 1, at 6. Later in

the same call, though, Veazey admitted that he really wanted a nude picture of her, but that he would have to "save that for in person." Def. Ex. 1, at 25-26. Jodi subsequently sent a picture to Veazey, telling him it was "not the knd u want tho." Gov. Ex. 1, at 60. The detectives used a non-revealing photo donated by a female law enforcement officer depicting that officer when she was a teenager. Veazey told Jodi this picture was acceptable so long as he could see her face. By the middle of December, Veazey had not received the picture Jodi told him she sent, and he asked her to send another. He also told her that without a picture, a phone number and an address, he would not come to visit her because of his experience with the other girl who had not shown up for his visit.

Veazey instructed Jodi in a telephone call on ways to seduce her friend Missy, and followed up on this lesson in an online chat, reminding her to start by taking pictures and then see what happened. He also suggested giving Missy alcohol to "loosen her up." Gov. Ex. 1, at 91. When Jodi later revealed she had not gotten very far in her seduction of Missy, Veazey expressed disappointment, but asked "did yall take pics." Gov. Ex. 1, at 101. Jodi replied that she had taken pictures but that the girls did not like them. Veazey made clear to Jodi that he wanted to have sex with both her and Missy but that this plan would not work unless Jodi had already seduced Missy. As soon as Jodi reported that she had completed this task, Veazey called her on the phone to discuss his trip to Decatur. He told Jodi that he wanted both girls to strip for him, and that he would bring a camera to take pictures on the first night they were together. Def. Ex. 6, at 13-14, 17-18.

Jodi then introduced Missy into the online chats. One of Veazey's first questions to Missy was whether the girls had taken some pictures for him. Missy asked if Veazey wanted pictures when they met in person and he replied

that he wondered what Missy looked like. Gov. Ex. 1, at 111. Later in the chat, Veazey again asked Missy to send a picture, telling her he already had a picture of Jodi. Gov. Ex. 1, at 112. In a subsequent chat, Veazey again asked Missy for a picture, telling her he would accept a regular picture. Gov. Ex. 1, at 125-26. Of course, this reference to a "regular" picture is surrounded by Veazey's questions about Missy's fantasies and sexual preferences. When Missy asked Veazey what kind of pictures they would take when he visited, he responded, "whatever kind u want." Gov. Ex. 1, at 127-28. Missy asked whether he meant he would take pictures of them having sex. He told her that if she liked what she saw, she could take a picture, and he would do the same. He told Missy in graphic language that if she wanted a picture of them having sex, she could take one or have Jodi take one. *Id*. Later in the same chat, Missy asked about pictures again, and Veazey said that if Missy did not want any pictures taken, then he would not take any. After Missy assured him she had no problem with pictures, he told her she could tear up any pictures she did not like. He told her he had a digital camera, a camera that developed pictures immediately, and a camcorder. Gov. Ex. 1, at 131-32. When Missy asked if he was bringing them all, he replied, "if u want me too." *Id*. Missy told Veazey that she wanted him to bring the cameras and that she might like to make a movie. Veazey replied, "i like the way u think." Gov. Ex. 1, at 132.

In a later online chat with Jodi, Veazey told Jodi that Missy wanted to be filmed. Gov. Ex. 1, at 144. Jodi indicated that was agreeable to her, and the next time Veazey chatted with Missy, he reported that "jodi liked the idea of a movie too." Gov. Ex. 1, at 147. During a particularly graphic exchange with Missy in which Missy indicated she was masturbating, Veazey remarked, "damn wish u had a cam." Gov. Ex. 1, at 149-50. The term "cam" had appeared in prior conversations as shorthand for camera.

In a phone call with Jodi a few days before his scheduled trip to Decatur, Veazey discussed bringing camera equipment to take pictures of their sexual activities. Veazey specifically mentioned a Polaroid camera, a digital camera, and a camcorder. Def. Ex. 6, at 17-18. Veazey was concerned about the cost of a battery for his camcorder and Jodi told him he would just have to remember the girls' dance (they had previously discussed the girls performing a strip tease for Veazey) in his head. Veazey replied, "Hell, remember it in my head. Shoot, I'll be watching it all the way home. What are you talking about. Everybody will be looking over my shoulder. I'll be going, sorry, ten dollars to watch." Def. Ex. 7, at 25-26.

When Veazey arrived in Decatur on January 7, 2005, he was met by law enforcement officers and taken into custody. He was carrying with him, among other things, a Polaroid camera, a digital camera and a camcorder. Veazey was charged in a two-count indictment with using the internet, a facility of interstate commerce, to knowingly persuade, induce, entice and coerce a minor to engage in sexual activity, in violation of 18 U.S.C. § 2422(b), and knowingly traveling in interstate commerce for the purpose of engaging in a sexual act with a minor, in violation of 18 U.S.C. § 2423(b). Veazey pled guilty to both counts. As we indicated above, the district court sentenced Veazey to a 324 month term of imprisonment, applying a guidelines cross-reference relating to creating visual depictions of criminal sexual conduct with minors.

## II.

Prior to sentencing, a probation officer prepared a Presentence Report ("PSR"). The PSR recommended application of the "visual depiction" cross-reference, and cited relevant portions of the transcript in support. Veazey objected to the PSR's characterization of the online and

telephone transcripts. According to Veazey, the PSR made it appear as if discussions of sexual photographs and videos permeated the conversations when in fact such discussions constituted a minuscule portion of the transcripts. Veazey also argued that the cross-reference should apply only when the purpose of the defendant's prohibited sexual conduct was to produce pictorial representations of that conduct. Veazey contended that his purpose was to entice the minors to have sex, not to take sexually explicit photographs. The photos, he argued, would have been a by-product of, rather than the purpose of, the encounter. The probation officer agreed that references to photos or videos occupied only 5% of the online conversations and 3% of the phone transcripts. Not all of these references were to sexually oriented pictures. Because Veazey objected to the PSR's characterization of the transcripts and to the sufficiency of the evidence, the district court reviewed all of the transcripts to place the photo references in context. The court noted that the discussions of sexual pictures occupied approximately the same amount of time as discussions about the price of airplane tickets. The court agreed that Veazey's primary purpose was to have sex with Jodi and Missy. The court found, however, that taking sexually oriented pictures was a secondary purpose of Veazey's criminal conduct, and that Congress intended the cross-reference to apply in that situation. The court therefore applied the cross-reference.

On appeal, Veazey contends that there was only a "scintilla of evidence" that he committed these offenses for the purpose of producing a visual depiction of the conduct. According to Veazey, that evidence consists of a few e-mail messages where Veazey requested a nude picture; Veazey's agreement to take sexually explicit pictures if that was what the agents posing as minors wanted; and Veazey's possession of three cameras when he

arrived in Decatur for a sexual encounter with what he believed were two minors. Veazey contends that the evidence was "woefully insufficient" to support application of the cross-reference because nude pictures are not in and of themselves pornographic; one of the agents was the first to broach the topic of pornographic videos; and the agents asked Veazey to bring the cameras. He asks that we vacate his sentence and remand for re-sentencing without regard to the cross-reference.

We review the district court's findings of fact at sentencing for clear error. *United States v. Swanson*, 483 F.3d 509, 513 (7th Cir. 2007); *United States v. Baldwin*, 414 F.3d 791, 798 (7th Cir. 2005). We review the district court's interpretation of the sentencing guidelines *de novo*. *United States v. Chamness*, 435 F.3d 724, 726 (7th Cir. 2006). After *United States v. Booker*, 543 U.S. 220 (2005), we review a sentence for reasonableness, and sentences that are within the properly calculated guidelines range are entitled to a rebuttable presumption of reasonableness. *United States v. Rita*, ___ S.Ct. ___, 2007 WL 1772146, \*3-\*6 (June 21, 2007); *United States v. Rodriguez-Alvarez*, 425 F.3d 1041, 1045 (7th Cir. 2005); *United States v. Mykytiuk*, 415 F.3d 606, 608 (7th Cir. 2005). Guideline section 2G1.3 applies to offenses involving interstate travel to engage in prohibited sexual conduct with a minor. That section sets the base offense level at 24. Subsection (c) of that guideline provides:

> If the offense involved causing, transporting, permitting, or offering or seeking by notice or advertisement, a minor to engage in sexually explicit conduct for the purpose of producing a visual depiction of such conduct, apply § 2G2.1 (Sexually Exploiting a Minor by Production of Sexually Explicit Visual or Printed Material; Custodian Permitting Minor to Engage in Sexually Explicit Conduct; Advertisement for Minors

> to Engage in Production), if the resulting offense level is greater than that determined above.

U.S.S.G. § 2G1.3(c)(1). Section 2G2.1, the cross-reference to which Veazey objects, provides for a base offense level of 32. The Application Notes for § 2G2.1 provide that a "minor" includes, among other things, "an undercover law enforcement officer who represented to a participant that the officer had not attained the age of 18 years." U.S.S.G. § 2G2.1, Application Note 1. To the base offense level of 32, the district court added two levels because the minor involved was older than twelve and younger than sixteen years old, and two levels because the offense involved the use of a computer or an interactive computer service to solicit participation by a minor in sexually explicit conduct, for a subtotal of 36. *See* U.S.S.G. § 2G2.1(b)(1)(B); § 2G2.1(b)(6)(B). The multiple count adjustment resulted in another 2 level increase under § 3D1.4. From the resulting level of 38, the district court subtracted 3 levels for acceptance of responsibility under § 3E1.1(a) and (b)(2). This resulted in a total offense level of 35. The court then added 5 levels under § 4B1.5(b)(1), which applies to repeat and dangerous sex offenders against minors, because Veazey had previously pled guilty in Texas to indecency with a child/sexual contact. This resulted in an adjusted offense level of 40, a criminal history category of II, and a guidelines range of 324 to 405 months. The statutory maximum was 30 years. The court sentenced Veazey to 324 months, the low end of the guidelines range.

In doing so, the court concluded as a matter of law that the cross-reference could apply when the defendant's purpose to create a visual depiction was a secondary, rather than a primary, purpose of the offense conduct. Whether the cross-reference may apply when there is a secondary, rather than primary, purpose to produce a visual depiction is a question of first impression in our

circuit. Application Note 5 for § 2G1.3 provides that the cross-reference in subsection (c)(1) "is to be construed broadly and includes all instances in which the offense involved employing, using, persuading, inducing, enticing, coercing, transporting, permitting, or offering or seeking by notice, advertisement or other method, a minor to engage in sexually explicit conduct for the purpose of producing any visual depiction of such conduct." Nowhere does the guideline require that producing a visual depiction be the *only* purpose of the defendant in committing the offense.

In the case of a virtually identical guideline cross-reference, the Ninth Circuit concluded that the cross-reference should apply when the defendant has only a secondary purpose to produce a visual depiction of sexually explicit material. *United States v. Hughes*, 282 F.3d 1228, 1230-32 (9th Cir. 2002). In *Hughes*, the cross-reference to § 2G2.1 came from § 2G1.1(c), which directed the court to apply the cross-reference if the sexual conduct involved in the underlying offense was "for the purpose of producing a visual depiction of such conduct." 282 F.3d at 1230.[3] The court rejected a textual argument that the article "the" modifying "purpose" limited application to instances where the defendant's sole or exclusive purpose was to produce a visual depiction. 282 F.3d at 1231. According to the court, the Application Note urging the court to construe the cross-reference broadly demonstrated an intent by the Sentencing Commission to apply the cross-reference with equal force to single-minded defendants and defendants with multiple motives. *Id*. The

---

[3] *Hughes* interprets the version of § 2G1.1 in effect at that time. That section was subsequently revised, but the language interpreted by the *Hughes* court still appears in a number of guidelines, including the one that we interpret today.

court also rejected a contention that, in the case of multiple motives, the cross-reference applied only when the primary purpose was to produce a visual depiction. The wording of the guideline was too broad to contain such a limitation. *Id.* Noting that the cross-reference was to apply broadly and include "all instances" where the defendant had a purpose to create a visual depiction, the court concluded that it was "not required to rank the reasons that a defendant had for committing an offense." *Hughes*, 282 F.3d at 1231. Rather, the court needed only to determine "whether *one* of the defendant's purposes was to create a visual depiction." *Hughes*, 282 F.3d at 1231-32 (emphasis in original).

We see no reason to depart from the sound reasoning of our sister circuit interpreting a parallel provision. *See also United States v. Garcia*, 411 F.3d 1173, 1179-80 (10th Cir. 2005) (applying a similar cross-reference from § 2G2.2 where the defendant sought both to have the mother of two minor girls engage in sexual conduct with her daughters and also to photograph this activity for the defendant). The guideline and Application Notes make clear that the cross-reference should apply if any one of the defendant's purposes in committing the offense was to create a visual depiction thereof. We therefore hold that the cross-reference applies when one of the defendant's purposes was to create a visual depiction of sexually explicit conduct, without regard to whether that purpose was the primary motivation for the defendant's conduct.

We turn then to the district court's factual conclusion that Veazey possessed a secondary purpose to create a visual depiction of sexually explicit conduct with minors. The Application Notes to § 2G2.1 provide that "sexually explicit conduct" has the meaning given that term in 18 U.S.C. § 2256(2). That statute defines sexually explicit conduct as "actual or simulated—(i) sexual intercourse,

including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex; (ii) bestiality; (iii) masturbation; (iv) sadistic or masochistic abuse; or (v) lascivious exhibition of the genitals or pubic area of any person." 18 U.S.C. § 2256(2)(A). Under this definition, Veazey argues, a request for nude pictures cannot justify application of the cross-reference. As we noted above, Veazey also contends that references to visual depictions of explicit sexual conduct occupy only a small fraction of the transcripts, and that references to creating visual depictions originated with the undercover agents. Veazey concedes that he was *willing* to produce visual depictions but contends that this was not his purpose.

Veazey cites *United States v. Crandon*, 173 F.3d 122 (3d Cir. 1999), in support of his argument that it is possible for a person wilfully to take a sexually explicit photo but not with the purpose of producing sexually explicit material. His purpose, he contends, was to have sex with Jodi and Missy. We find *Crandon* inapposite. In *Crandon*, the district court failed entirely to consider the defendant's purpose or state of mind when it applied a similar cross-reference, essentially holding the defendant strictly liable. On appeal, the court held that it was not enough to simply say that the photo speaks for itself. Rather, because the guideline referred to the defendant's purpose in taking the photograph, the court must ascertain whether the defendant's purpose was to create pornographic pictures. *Crandon*, 122 F.3d at 129. In the instant case, the district court did consider Veazey's purpose before applying the cross-reference. The only question remaining, then, is whether the court clearly erred in concluding that Veazey's purpose, at least in part, was to create a visual depiction of sexually explicit conduct. Veazey's argument is two-fold: first, at worst, he intended to take only nude pictures, which would not meet the definifion of sexually

explicit conduct defined in the statute. Second, it was the agents and not Veazey who raised the subject of camera equipment and sexually explicit photos, and so the transcripts do not contain sufficient evidence of an intent on Veazey's part to produce such pictures.

We find that there was more than enough evidence in the record to support the district court's conclusion that Veazey had a purpose to create a visual depiction of sexually explicit conduct. Although the references to photos or videos of any sort occupy a small percentage of the online and telephone transcripts, even a single reference may be sufficient, especially in the context of the extraordinarily explicit conversations and in light of the three cameras Veazey possessed when he was arrested. As the district court noted, a single reference to a particular sex act was sufficient for Veazey to demonstrate an intent to carry through with that act. In particular, the district court noted, the transcripts contained a single reference to anal sex and Veazey arrived in Decatur with a substance intended to facilitate that act.[4]

We also reject as frivolous Veazey's contention that he merely requested nude photographs that would not meet the definition of sexually explicit conduct. In addition to requesting nude photographs of both Jodi and Missy, Veazey suggested that the girls engage in particular sex acts with each other and send him photographs of their encounters. He also indicated a desire to photograph them the first night that he would be in Decatur. Taken alone, this exchange might not evidence a desire to take sexually explicit photos, but taken in the context of the many discussions Veazey had detailing the particular sexual conduct he intended to have with the girls

---

[4] We note that there were two or three such references but the district court's reasoning still stands. *See* Gov. Ex. 1, at 126, 133.

during his visit and especially on the first night, the district court did not err in concluding that Veazey intended to take sexually explicit photos. Veazey also indicated that he would be able to see the pictures of his encounter with the girls on his way home, that others would be looking over his shoulder, and that he intended to charge $10 to others who wished to see the pictures. Finally, although neither the parties nor the district court specifically cite this particular passage, in a graphic discussion with Missy, Veazey indicated a desire for Missy to take photos of herself masturbating. *See* Gov. Ex. 1, at 149-50. Such photos would clearly meet the standard set forth in 18 U.S.C. § 2256(2). In the context of these graphic online and telephone conversations, there remains no doubt what kind of pictures Veazey intended to take when he arrived in Decatur with camera equipment. The court did not err in inferring from the context of these discussions that Veazey wanted more than nude photos; he wanted photos and videos that would easily meet the definition of sexually explicit conduct set forth in the statute.

Finally, we reject Veazey's claim that he was simply complying with the undercover agents' requests to bring camera equipment to Decatur. First, this characterization of the evidence is untrue as a factual matter. Veazey was the first person to discuss photographs, and in fact asked for a nude photo of Jodi in their second online exchange. Only after Jodi balked at his repeated requests for pictures ("u want me or jus pics. . . . i really hope u wasnt jus sayin all tha fer pics") did Veazey pull back and moderate his language. The discussions of camera equipment arose from Veazey's repeated requests for nude photos, photos of Jodi and Missy engaging in sexual conduct and photos of the planned meeting in Decatur.

Veazey cites, among other things, a telephone call with Jodi as evidence that it was the agents' idea to bring

camera equipment and that he merely agreed with this
request. In that exchange, Jodi asked, "Were you wanting
to do pictures too?" R. 28-6, at 17. Veazey replied, "Yeah,
if you don't care." When Jodi then raised the issue of a
printer, Veazey replied that he had a camera that develops
the picture immediately, without the need for a printer.
He spontaneously added that he also had a digital
camera but did not know how to use it. When Jodi told
him digital cameras were easy to operate, Veazey replied,
"Alright. I'll bring it too then." R. 28-6, at 17-18. As
evidence that the agents encouraged him to bring the
cameras after he expressed reluctance to do so, he cites
another telephone call with Jodi:

> Veazey: I don't know about the camcorder thing. That
> battery may be pretty expensive.
>
> Jodi: Oh. Okay.
>
> Veazey: I mean, I'll bring it and we'll check but.

Following a brief discussion of the expense of the unusual
battery required, Jodi said, "Oh. That's okay. Don't worry
about it." R. 28-7, at 25-26. Veazey replied by saying they
could go to Walmart to see if he could purchase the battery
there. *Id.* To suggest that the agents raised the subject
of camera equipment and encouraged a reluctant Veazey
to bring the cameras requires a fanciful interpretation of
the evidence. As these exchanges indicate, Veazey needed
no encouragement, and the agent posing as Jodi actually
discouraged Veazey from bringing the equipment when
she told Veazey not to worry about the camcorder. Recall
too that in the second internet exchange between Jodi
and Veazey, Jodi expressed dismay that Veazey perhaps
simply wanted pictures of her, causing Veazey temporarily
to back off of his repeated requests. Rather than en-
courage Veazey, the agent portraying Jodi at times dis-
couraged Veazey from discussing photographs. The agent
portraying Missy was, in keeping with her character as a

precocious teen, more forthcoming about sexually explicit pictures and videos. But even in the case of Missy, the clearest reference to Veazey wanting a picture of sexually explicit conduct came from Veazey himself, with no encouragement from the agent. *See* Gov. Ex. 1, at 149-50. In the context of all of the discussions between the agents and Veazey, there is no doubt that Veazey had a dual purpose of both molesting the girls and creating a visual depiction of his criminal conduct.

Second, to the extent that Veazey is claiming sentencing manipulation, there is no such defense in this circuit. *United States v. Wagner*, 467 F.3d 1085, 1090 (7th Cir. 2006); *United States v. Pearson*, 113 F.3d 758, 762 (7th Cir. 1997); *United States v. Garcia*, 79 F.3d 74, 76 (7th Cir. 1996). Nor does Veazey make out an adequate claim for sentencing entrapment, which is distinct from sentencing manipulation. *Wagner*, 467 F.3d at 1090; *United States v. Hale*, 448 F.3d 971, 989 (7th Cir. 2006), *cert. denied*, 127 S.Ct. 1020 (2007). Sentencing entrapment occurs when "an individual predisposed to commit a lesser crime commits a more serious offense as a result of 'unrelenting government persistence.'" *Hale*, 448 F.3d at 989. "The government overcomes an alleged entrapment defense by establishing that the defendant was predisposed to commit the offense charged. This is not a great hurdle; all that must be shown to establish predisposition and thus defeat the defense of entrapment is willingness to violate the law without extraordinary inducements." *Hale*, 448 F.3d at 989. The government agents offered him no extraordinary inducements (or any inducements at all) to bring the camera equipment to record sexually explicit conduct with minors. A reading of the full transcript demonstrates that Veazey was predisposed to such conduct. In short, the district court did not err in concluding that, when Veazey showed up for a sexual encounter with two teenage girls carrying three cameras, following graphic

conversations where he expressed a desire for sexually explicit photos, he intended to create a visual depiction of sexually explicit conduct with minors. Veazey raises no other challenge to the reasonableness of his sentence, which was at the bottom of the guidelines range. *See Mykytiuk*, 415 F.3d at 608. We therefore affirm the judgment of the district court in every respect.

AFFIRMED.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*